# EXHIBIT A

1   McGREGOR W. SCOTT
    United States Attorney
2   AUDREY B. HEMESATH
    HEIKO P. COPPOLA
3   Assistant United States Attorneys
    501 I Street, Suite 10-100
4   Sacramento, CA 95814
    Telephone:  (916) 554-2700
5
    CHRISTOPHER J. SMITH
6   Acting Associate Director
    JOHN D. RIESENBERG
7   Trial Attorney
8   Office of International Affairs
    Criminal Division
9   U.S. Department of Justice
    1301 New York Avenue NW
10  Washington, D.C. 20530
    Telephone: (202) 514-0000
11

12
    Attorneys for Plaintiff
13  United States of America

14              IN THE UNITED STATES DISTRICT COURT

15              EASTERN DISTRICT OF CALIFORNIA

16

17  IN THE MATTER OF

18  THE EXTRADITION OF OMAR AMEEN        CASE NO.  2:18-MJ-0152 EFB

19

20

21

22          MEMORANDUM OF EXTRADITION LAW AND REQUEST

23          FOR DETENTION PENDING EXTRADITION PROCEEDINGS

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.      FACTUAL BACKGROUND ..................................................................................1

II.     LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS...................................2

        A.      The limited role of the Court in extradition proceedings.............................2

        B.      The Requirements for Certification ...........................................................3

                1.      **Authority Over the Proceedings** ................................................3

                2.      **Jurisdiction Over the Fugitive** ..................................................4

                3.      **Treaty in Full Force and Effect** ................................................4

                4.      **Crimes covered by the treaty.** ...................................................4

                5.      **Probable cause that the fugitive has committed the offense.** ...........5

        C.      An extradition hearing follows unique procedures. ....................................6

        D.      Rule of Non-Inquiry.................................................................................8

III.    AMEEN CANNOT OVERCOME THE STRONG PRESUMPTION AGAINST
        BAIL IN INTERNATIONAL EXTRADITION PROCEEDINGS AND IS BOTH A
        DANGER TO THE COMMUNITY AND A FLIGHT RISK ........................................8

        A.      Ameen cannot overcome the presumption against bail. .................................9

                1.      **Ameen cannot demonstrate special circumstances.** ........................10

                2.      **Ameen is a danger to the community.** ..........................................11

                        a.      **Ameen's History as a Member of AQI and ISIS** ................................11

                        b.      **Warrants in Iraq** ...................................................15

                        c.      **Misrepresentations in Refugee Application** .........................................16

                        d.      **Return to Iraq and Murder of Ihsan**...............................20

                        e.      **Immigration to the United States** ...............................24

                3.      **Ameen is a flight risk.** ..............................................25

IV.     CONCLUSION.................................................................................26

# TABLE OF AUTHORITIES

**Page**

## Cases

*Artukovic v. Rison,*
   784 F.2d 1354 (9th Cir. 1986) ........................................................................... 5, 6

*Barapind v. Reno,*
   225 F.3d 1100 (9th Cir. 2000) ........................................................................... 2, 3

*Bingham v. Bradley,*
   241 U.S. 511 (1916) .............................................................................................. 7

*Caplan v. Vokes,*
   649 F.2d 1336 (9th Cir. 1981) ............................................................................... 6

*Charlton v. Kelly,*
   229 U.S. 447 (1913) ........................................................................................... 3, 7

*Clarey v. Gregg,*
   138 F.3d 764 (9th Cir. 1998) ................................................................................. 5

*Collins v. Loisel,*
   259 U.S. 309 (1922) ........................................................................................ 5, 6, 7

*Collins v. Loisel,*
   262 U.S. 426 (1923) .............................................................................................. 7

*Cucuzzella v. Keliikoa,*
   638 F.2d 105 (9th Cir. 1981) ................................................................................. 5

*Emami v. U.S. Dist. Ct.,*
   834 F.2d 1444 (9th Cir. 1987) ............................................................................... 6

*Factor v. Laubenheimer,*
   290 U.S. 276 (1933) ........................................................................................... 4, 5

*Gerstein v. Pugh,*
   420 U.S. 103 (1975) .............................................................................................. 6

*Grin v. Shine,*
   187 U.S. 181 (1902) .............................................................................................. 5

*Hooker v. Klein,*
   573 F.2d 1360 (9th Cir. 1978) ............................................................................... 7

*In re Extradition of Howard,*
   996 F.2d 1320 (1st Cir. 1993) ............................................................................... 4

*In re Extradition of Orozco,*
   268 F. Supp. 2d 1115 (D. Ariz. 2003) ................................................................ 11

ii

*In re Extradition of Wadge*,
    15 F. 864 (S.D.N.Y. 1883) ................................................................................................... 7

*In re Kaine*,
    55 U.S. 103 (1852) ............................................................................................................... 8

*In re Mitchell*,
    171 F. 289 (S.D.N.Y. 1909) ................................................................................................. 8

*Jhirad v. Ferrandina*,
    536 F.2d 478 (2d Cir. 1976) ............................................................................................... 25

*Kamrin v. United States*,
    725 F.2d 1225 (9th Cir. 1984) ..................................................................................... 6, 8, 10

*Koskotas v. Roche*,
    931 F.2d 169 (1st Cir. 1991) ................................................................................................ 8

*Manta v. Chertoff*,
    518 F.3d 1134 (9th Cir. 2008) ............................................................................................. 3

*Martinez v. United States*,
    828 F.3d 451 (6th Cir. 2016) ............................................................................................... 5

*Matter of the Extradition of Antonowitz*,
    244 F. Supp. 3d 1066 (C.D. Cal. 2017) ............................................................................. 11

*Matter of the Extradition of Beresford-Redman*,
    753 F. Supp. 2d 1078 (C.D. Cal. 2010) ............................................................................. 10

*Matter of the Extradition of Garcia*,
    615 F. Supp. 2d 162 (S.D.N.Y. 2009) ................................................................................. 9

*Matter of the Requested Extradition of Kirby*,
    106 F.3d 855 (9th Cir. 1996) ........................................................................................... 4, 9

*Matter of the Extradition of Kraiselburd*,
    786 F.2d 1395 (9th Cir. 1986) ............................................................................................. 7

*Matter of the Extradition of Kyung Joon Kim*,
    2004 WL 5782517 (C.D. Cal. July 1, 2004) ...................................................................... 11

*Matter of the Extradition of Mainero*,
    950 F. Supp. 290 (S.D. Cal. 1996) ..................................................................................... 10

*Matter of the Extradition of Mathison*,
    974 F. Supp. 2d 1296 (D. Or. 2013) .................................................................................... 7

*Matter of the Extradition of Martinelli Berrocal*,
    263 F. Supp. 3d 1280 (S.D. Fla. 2017) ........................................................................... 9, 11

*Matter of the Extradition of Nacif–Borge*,
    829 F. Supp. 1210 (D. Nev. 1993) ..................................................................................... 10

*Matter of the Extradition of Noeller*,
  2017 WL 6462358 (N.D. Ill. Dec. 19, 2017) ......................................................... 10, 11

*Matter of the Extradition of Pelletier*,
  2009 WL 3837660 (S.D. Fla. Nov. 16, 2009) ................................................................ 11

*Matter of the Extradition of Perez-Cueva*,
  2016 WL 884877 (C.D. Cal. Mar. 7, 2016) .................................................................... 26

*Matter of the Extradition of Powell*,
  4 F. Supp. 2d 945 (S.D. Cal. 1998) ................................................................................ 7

*Matter of the Extradition of Sidali*,
  868 F. Supp. 656 (D.N.J. 1994) ................................................................................ 10, 11

*Matter of the Requested Extradition of Smyth*,
  976 F.2d 1535 (9th Cir. 1992) ....................................................................................... 10

*McElvy v. Civiletti*,
  523 F. Supp. 42 (S.D. Fla. 1981) ..................................................................................... 5

*Neely v. Henkel*,
  180 U.S. 109 (1901) ......................................................................................................... 6

Oen Yin-Choy v. Robinson,
  858 F.2d 1400 (9th Cir. 1988) ......................................................................................... 7

*Prasoprat v. Benov*,
  421 F.3d 1009 (9th Cir. 2005) ..................................................................................... 3, 8

*Quinn v. Robinson*,
  783 F.2d 776 (9th Cir. 1986) ................................................................................... 3, 6, 8

*Salerno v. United States*,
  878 F.2d 317 (9th Cir. 1989) ...................................................................................... 9, 10

*Simmons v. Braun*,
  627 F.2d 635 (2d Cir. 1980) ............................................................................................ 7

*Then v. Melendez*,
  92 F.3d 851 (9th Cir. 1996) ......................................................................................... 4, 6

*United States v. Botero*,
  604 F. Supp. 1028 (S.D. Fla. 1985) ............................................................................... 25

*United States v. Hir*,
  517 F.3d 1081 (9th Cir. 2008) ....................................................................................... 25

*United States v. Kin-Hong*,
  83 F.3d 523 (1st Cir. 1996) ........................................................................................... 10

*United States v. Kin-Hong*,
  110 F.3d 103 (1st Cir. 1997) ........................................................................................... 3

*United States v. Leitner*,
    784 F.2d 159 (2d Cir. 1986)................................................................................ 8, 11

*United States v. Snyder*,
    2013 WL 1364275 (D. Ariz. Apr. 3, 2013) ......................................................... 9

*Vo v. Benov*,
    447 F.3d 1235 (9th Cir. 2006) .......................................................................... 3, 6

*Wright v, Henkel*,
    190 U.S. 40 (1903)........................................................................................... 9, 10

*Zanazanian v. United States*,
    729 F.2d 624 (9th Cir. 1984) ........................................................................... 6, 7

## Statutes

8 U.S.C. § 1227(a)(1)(A) ........................................................................................... 2

8 U.S.C. § 1882(a)(6)(C)(i)........................................................................................ 2

18 U.S.C. § 3141 ........................................................................................................ 8

18 U.S.C. § 3141(a) ................................................................................................... 8

18 U.S.C. § 3146(a) ................................................................................................. 10

18 U.S.C. § 3156 ........................................................................................................ 8

18 U.S.C. § 3156(a)(2)............................................................................................... 8

18 U.S.C. § 3181 ............................................................................................... 1, 2, 8

18 U.S.C. § 3184 ............................................................................................... 3, 4, 8

18 U.S.C. § 3186 ................................................................................................... 3, 8

Immigration and Nationality Act § 212(a)(6)(C)(i) ............................................... 2

Immigration and Nationality Act § 237(a)(1)(A) .................................................. 2

## Rules

E.D. Cal. Local Rule 302(b)(8) ................................................................................. 4

Fed. R. Crim. P. 1(a)(5)(A) ....................................................................................... 7

Fed. R. Evid. 1101(d)(3) ........................................................................................... 6

## Miscellaneous

Extradition Treaty Between the United States of America and Iraq, U.S.-Iraq, June 7, 1934
    49 Stat. 3380 ..................................................................................................... 2

## MEMORANDUM OF POINTS AND AUTHORITIES

The United States of America, in fulfilling its treaty obligations to the Republic of Iraq, respectfully requests that the fugitive in this case, Omar Abdulsattar Ameen ("Ameen"), be held without bond pending the hearing on the certification of his extradition, pursuant to 18 U.S.C. §§ 3181 *et seq.* Ameen is alleged to be a member of a designated foreign terrorist organization—Al Qaeda in Iraq ("AQI") and its successor organization, Islamic State of Iraq and ash-Sham ("ISIS").  According to the evidence presented in Iraq's extradition request, Ameen committed a violent, premeditated murder on behalf of ISIS.  Evidence gathered in a Federal Bureau of Investigation ("FBI") investigation of Ameen, ongoing since 2016, corroborates Ameen's membership in and actions on behalf of AQI and ISIS, including the murder.  All international extradition proceedings begin with a strong presumption against bail, and in this extradition proceeding, Ameen cannot meet his burden of showing that special circumstances exist to warrant his release.  Even if he could, he cannot demonstrate that he poses no risk of flight or danger to the community.

## I.   FACTUAL BACKGROUND

Iraq seeks the extradition of Ameen[1] to stand trial on charges of premeditated murder, in violation Article 406 of Iraq's penal code.  Judge Deaa Jaafar, President of Baghdad Al-Karkh Inquiry Court, issued a warrant for Ameen's arrest on May 16, 2018.  The arrest warrant and detention order were issued on the basis of the following facts alleged in the extradition request:

The town of Rawah, Iraq, fell to ISIS on or about June 21, 2014.  The following day, on or about June 22, 2014, a caravan of four vehicles carrying armed members of the ISIS organization entered Rawah and drove to the house of Ihsan Abdulhafiz Jasim ("Ihsan").  Omar Ameen was a member of this armed caravan.  At seven o'clock that evening, the ISIS caravan opened fire on Ihsan's family home.  Ameen then shot the victim, Ihsan.

Ihsan was brought to Rawah hospital, where a death certificate was issued on June 23, 2014.  The cause of death listed is gunshot to the chest.

---

[1] Omar Ameen's name is variably referred to in translated documents as "'Umar' Abd-al-Sattar Amin Husayn al-Rawi-al-Sarhani" or "Omar Abdul Sattar Al Rawi," or some other transliteration of his Arabic name.

Following Ihsan's death, a post appeared on social media, under the username "Iraqi Sunni Flag@FlagSunna," celebrating the killing.  The post stated "[t]oday is the day to eliminate some rotten heads.  Now in Rawah, the criminal Ihsan [Abdulhafiz] has been eliminated at the hands of the Mujahidin."

Iraq has requested that Ameen be extradited pursuant to its extradition treaty with the United States.  Extradition Treaty Between the United States of America and Iraq, U.S.-Iraq, June 7, 1934, 49 Stat. 3380.  The United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a Complaint in this District seeking a warrant for Ameen's arrest.  This Court issued the arrest warrant on August 14, 2018, and Ameen was arrested on August 15, 2018.[2] Ameen is currently detained in the Sacramento County Jail.

Since 2016, the FBI Joint Terrorism Task Force has investigated Ameen for suspected violations of 18 U.S.C. § 1546 (Fraud and misuse of visas, permits, and other documents), among other suspected violations.   As part of this investigation, the FBI has interviewed at least eight witnesses, and received documents from Iraq, which corroborate Ameen's involvement with AQI and ISIS, including the murder that is alleged in the extradition request.  The salient facts of this investigation are set forth below to the extent that they are relevant to this Court's bail determination.

## II.   LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

### A.   The limited role of the Court in extradition proceedings.

The extradition process is *sui generis*.  Extradition is primarily an executive function with a specially defined role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge."  18 U.S.C. § 3184.  The Secretary of State, and not the

---

[2] At the same time, Ameen was served with a Notice to Appear, charging him with violation of 8 U.S.C. § 1227(a)(1)(A); Immigration and Nationality Act Section 237(a)(1)(A), as being, at the time of entry or of adjustment of status, within one or more of the classes of aliens inadmissible by the laws existing at such time, to wit:  aliens who seek to procure (or have sought to procure, or who have procured) a visa, or other documentation, or admission into the United States, or other benefit provided under the Act, by fraud or by willfully misrepresenting a material fact, under 8 U.S.C. § 1882(a)(6)(C)(i); Immigration and Nationality Act Section 212(a)(6)(C)(i) of the Act.  These removal proceedings against Ameen will remain pending as this extradition matter proceeds first.  *Barapind v. Reno*, 225 F.3d 1100, 1104–05 (9th Cir. 2000).

1  Court, then decides whether the fugitive should be surrendered to the requesting country.  18 U.S.C.

2  §§ 3184, 3186; *Prasoprat v. Benov*, 421 F.3d 1009, 1012 (9th Cir. 2005).  "This bifurcated procedure

3  reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution,

4  such as questions of the standard of proof, competence of evidence, and treaty construction, yet

5  simultaneously implicate questions of foreign policy, which are better answered by the executive

6  branch."  *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

7       At the extradition hearing, the Court's role is limited to considering the requesting country's

8  evidence and determining whether the legal requirements for certification for the fugitive's extradition—

9  as defined in the applicable extradition treaty, statutes, and case law—have been established.  *See Quinn*

10  *v. Robinson*, 783 F.2d 776, 786 n.3 (9th Cir. 1986) (citing *Charlton v. Kelly*, 229 U.S. 447, 461 (1913))

11  (analogizing extradition hearing to a preliminary hearing in a criminal case).  If the Court finds that the

12  requirements for certification have been met, it must provide the certification to the Secretary of State,

13  together with a copy of any testimony taken before the Court, and must commit the fugitive to the

14  custody of the U.S. Marshal to await the Secretary's final determination regarding surrender.  18 U.S.C.

15  § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the

16  person so charged to the proper jail, there to remain until such surrender shall be made"); *see Vo v.*

17  *Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006); *Barapind v. Reno*, 225 F.3d 1100, 1105 (9th Cir. 2000).

18       **B.**    **The requirements for certification**

19       The Court should certify to the Secretary of State that a fugitive is extraditable when the

20  following requirements have been met:  (1) the judicial officer is authorized to conduct the extradition

21  proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full

22  force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there

23  is sufficient evidence to support a finding of probable cause as to each charge.  *See Manta v. Chertoff*,

24  518 F.3d 1134, 1140 (9th Cir. 2008).  The following sections briefly discuss each of those requirements.

25       **1.**    **Authority over the proceedings**

26       The extradition statute authorizes proceedings to be conducted by "any justice or judge of the

27  United States, or any magistrate judge authorized so to do by a court of the United States, or any judge

28  of a court of record of general jurisdiction of any State."  18 U.S.C. § 3184.  As such, the judicial officer

1  conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial

2  power of the United States," *In the Matter of the Requested Extradition of Kirby*, 106 F.3d 855, 866 (9th

3  Cir. 1996), but rather is acting in a "non-institutional capacity by virtue of a special authority," *In re*

4  *Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993).  Local Rule 302(b)(8) identifies extradition

5  as a duty to be performed by a Magistrate Judge in this District.

6  ### 2.    **Jurisdiction over the fugitive**

7  The Court has jurisdiction over a fugitive, such as Ameen, who is found within its jurisdictional

8  boundaries.  18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person

9  found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

10  ### 3.    **Treaty in full force and effect**

11  Section 3184 provides for extradition in specifically defined situations, including whenever a

12  treaty or convention for extradition is in force between the United States and the requesting state.  *See*

13  *id.*; *see also Then v. Melendez*, 92 F.3d 851, 853 (9th Cir. 1996) (noting that "the executive branch does

14  not have the power to extradite alleged criminals absent a valid extradition treaty").  The government

15  will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an

16  attorney in the Office of the Legal Adviser for the U.S. Department of State, attesting that there is a

17  treaty in full force and effect between the United States and Iraq.  The Court must defer to the

18  Department of State's determination in that regard.  *Then*, 92 F.3d at 854.

19  ### 4.    **Crimes covered by the treaty**

20  Extradition treaties create an obligation for the United States to surrender fugitives under the

21  circumstances defined in the treaty.  Article I of the applicable treaty in this case provides for the return

22  of fugitives charged with, or convicted of, an extraditable offense, as that term is defined under the

23  Treaty.  Article II of the Treaty contains a list enumerating extraditable offenses.  In assessing whether

24  the crime for which extradition is requested is covered by the Treaty, the Court examines the description

25  of criminal conduct provided by Iraq in support of its charge, and decides whether that conduct

26  constitutes an offense among those listed in Article II.  *Factor v. Laubenheimer*, 290 U.S. 276, 299–300

27  (1933).  An offense is extraditable so long as the underlying conduct constitutes one of the enumerated

28  offenses.  *See, e.g.*, *id.*; *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986) (treaty that listed

"murder" as extraditable encompassed offenses charged as "war crimes"). In determining whether the conduct constitutes an enumerated offense, "a narrow and restricted construction is to be avoided . . . [and] if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred." *Factor*, 290 U.S. at 293– 94.

Article II of the Treaty defines offenses as extraditable if the criminal conduct is punishable under the laws of both the United States and Iraq. In assessing whether the crime for which extradition (murder) is requested is punishable by the laws of both countries, the Court examines the description of criminal conduct provided by Iraq in support of its charge and decides whether that conduct, if it had been committed here, would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See, e.g.*, *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107– 08 (9th Cir. 1981). A requesting country need not establish that its crimes are identical to ours. *Clarey v. Gregg*, 138 F.3d 764, 765 (9th Cir. 1998) ("The primary focus of dual criminality has always been on the conduct charged; the elements of the analogous offenses need not be identical."). Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922).

In fulfilling its function under Section 3184, the Court should liberally construe the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *Factor*, 290 U.S. at 298–300; *see also, e.g.*, *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"). Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

### 5.    **Probable cause that the fugitive has committed the offense**

To certify the evidence to the Secretary of State, the Court must conclude there is probable cause

to believe that the crime charged by Iraq was committed by the person before the Court.  *Vo*, 447 F.3d at 1237.  The evidence is sufficient, and probable cause is established, if it would cause a "prudent man" to "believ[e] that the (suspect) had committed or was committing an offense."  *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted).  The extradition judge's probable cause determination is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'"  *Quinn*, 783 F.2d at 791 (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 n.10 (9th Cir. 1981)).

### C.    An extradition hearing follows unique procedures

The purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive.  That determination is reserved for the foreign court.  *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901).  Accordingly, an extradition hearing is not a criminal proceeding.  *Kamrin v. United States*, 725 F.2d 1225, 1228 (9th Cir. 1984).

Extradition proceedings are governed by "the general extradition law of the United States and the provisions of the Treaty."  *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450–51 (9th Cir. 1987).  The Federal Rules of Evidence do not apply to extradition proceedings.  *See, e.g.*, *Then*, 92 F.3d at 855; *see also* Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition.").  Indeed, hearsay evidence is admissible at an extradition hearing, and, moreover, a certification of extraditability is properly based entirely on the authenticated documentary evidence and information provided by the requesting government.  *See, e.g.*, *Collins*, 259 U.S. at 317; *Artukovic*, 784 F.2d at 1356.  Nothing more is required, and typically nothing more is provided.  *See, e.g.*, *Zanazanian v. United States*, 729 F.2d 624, 627–28 (9th Cir. 1984) (police report describing witness statements is competent evidence).

Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing.  Indeed, requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty."  *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *see also, e.g.*, *Zanazanian*, 729 F.2d at 626–27.

The Federal Rules of Criminal Procedure also do not apply to extradition proceedings. *See, e.g.*, *In the matter of the Extradition of Mathison*, 974 F. Supp. 2d 1296, 1304 (D. Or. 2013); *see also* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."). Furthermore, many constitutional protections applicable in criminal cases do not apply. For example, a fugitive has no right to cross-examine witnesses who might testify at the hearing, *see, e.g.*, *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1406–07 (9th Cir. 1988); there is no Sixth Amendment right to a speedy trial, *see, e.g.*, *In the Matter of the Extradition of Kraiselburd*, 786 F.2d 1395, 1398 (9th Cir. 1986); the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see, e.g.*, *In the Matter of the Extradition of Powell*, 4 F. Supp. 2d 945, 951 (S.D. Cal. 1998) (citing *Collins v. Loisel*, 262 U.S. 426, 429 (1923)); the exclusionary rule is not applicable, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636–37 (2d Cir. 1980); and a fugitive does not have the right to confront his accusers, *see, e.g.*, *Bingham*, 241 U.S. at 517.

Relatedly, a fugitive's right to present evidence is severely constrained. A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country, but rather may only introduce evidence explaining the submitted evidence. *See Charlton*, 229 U.S. at 461–62. A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)). The admission of explanatory evidence is largely within the discretion of the Court. *Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir. 1978).

In addition, courts routinely reject technical and affirmative defenses in extradition proceedings. *See, e.g.*, *Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality"); *Hooker*, 573 F.2d at 1368 (noting that extradition court "properly may exclude evidence of alibi, or facts contradicting the government's proof, or of a defense such as insanity"). These issues, which require factual or credibility determinations, are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

**D.      Rule of non-inquiry**

All matters raised by the fugitive as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the Court.  18 U.S.C. §§ 3184 & 3186.  For example, the Secretary of State should address a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds.  *Prasoprat*, 421 F.3d at 1016 (extradition judge does not have authority to consider humanitarian objections to extradition); *Koskotas v. Roche*, 931 F.2d 169, 173–74 (1st Cir. 1991) (motives of requesting state is a matter for consideration by the executive branch); *Quinn*, 783 F.2d at 789–90 (noting that "the Secretary of State has sole discretion to determine whether a request for extradition should be denied because it is a subterfuge made for the purpose of punishing the accused for a political crime, or to refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive") (citation omitted).  This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State."  *See In re Kaine*, 55 U.S. 103, 110 (1852).

**III.      AMEEN CANNOT OVERCOME THE STRONG PRESUMPTION AGAINST BAIL IN INTERNATIONAL EXTRADITION PROCEEDINGS AND IS BOTH A DANGER TO THE COMMUNITY AND A FLIGHT RISK**

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*.  The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail.  Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal case.[3]  *Kamrin*, 725 F.2d at 1228.  Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory."  *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

---

[3] The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts.  *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2).  Here, Ameen is not charged with an "offense" within the meaning of 18 U.S.C. § 3156, but rather with murder committed in violation of the law of the requesting state, Iraq.

### A.  Ameen cannot overcome the presumption against bail

Unlike in domestic criminal cases, "[t]here is a presumption against bail in an extradition case." *Salerno v. United States*, 878 F.2d 317, 317 (9th Cir. 1989); *see also, e.g., United States v. Snyder*, No. 13-7082-mj, 2013 WL 1364275, at *2 (D. Ariz. Apr. 3, 2013) (noting that presumption against bail in extradition is "well-established").  The Supreme Court established this presumption against bail in *Wright v. Henkel*, explaining that when a foreign government makes a proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted.  The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. 40, 62 (1903).

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling.  When, as here, a requesting country meets the conditions of the Treaty, the United States has an "overriding interest in complying with its treaty obligations" to deliver the fugitive. *In the Matter of the Extradition of Garcia*, 615 F. Supp. 2d 162, 166 (S.D.N.Y. 2009); *see also Wright*, 190 U.S. at 62.  It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States.  Such reciprocity would be defeated if a fugitive flees after being released on bond. *See In the Matter of the Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1306 (S.D. Fla. 2017) ("[O]ur Executive Branch has a vested interest in enforcing our own treaty obligations for fear that other treaty partners will refrain from doing so in the future.  And a difficult but necessary measure in carrying out that responsibility is to secure a wanted individual and surrender him or her to the foreign jurisdiction.").

Thus, bail is only a possibility when the fugitive meets his burden of demonstrating each of three requirements:  (1) that there are special circumstances to warrant release; (2) that he is not a flight risk; and (3) that he is not a danger to the community. *See, e.g., Kirby*, 106 F.3d at 862–63 (courts must

examine "both the sufficiency of bail to assure that the performance of this court's duties will not be aborted by flight of the potential extraditee, and its propriety under *Wright v. Henkel*") (emphasis in original); *see also, e.g.*, *In the Matter of the Extradition of Nacif–Borge*, 829 F. Supp. 1210, 1215 (D. Nev. 1993) ("A person subject to international extradition may overcome the presumption against bail by presenting clear and convincing evidence demonstrating 'special circumstances' justifying release pending extradition proceedings and that the person will not flee or pose a danger to any other person or to the community.").  Ameen cannot meet his burden on any of these three requirements.

       1.    **Ameen cannot demonstrate special circumstances.**

As a threshold matter, Ameen must demonstrate that there are special circumstances in his case that would allow this Court to even consider the possibility of bail.  *Kamrin*, 725 F.2d at 1228 (holding that the "'special circumstances' requirement creates a different standard for extradition cases than for federal criminal cases, where bail is granted unless the judicial officer determines that release will not reasonably assure the appearance of the defendant as required"); *Salerno*, 878 F.2d at 317–18.  The Court does not even undertake the familiar flight risk/dangerousness analysis unless Ameen identifies a special circumstance that would warrant the possibility of bail.  *Id.*, 878 F.2d at 317–18.  In *Salerno*, the Ninth Circuit identified possible examples of a special circumstance:  a case where the fugitive has raised a substantial claim with a high probability of success; a serious deterioration of health while incarcerated; or an unusual delay in the appeal process.  878 F.2d at 317–18.

But, "[s]pecial circumstances must be extraordinary and not factors applicable to all defendants facing extradition."  *In the Matter of the Extradition of Mainero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996) (citing *In the Matter of the Requested Extradition of Smyth*, 976 F.2d 1535, 1535–36 (9th Cir. 1992)).  Courts have considered and rejected a lengthy list of would-be special circumstances, including: the complexity of the pending litigation, *see, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996); the fugitive's need to consult with an attorney and/or participate in pending litigation, *see, e.g.*, *Smyth*, 976 F.2d at 1535–36; the fugitive's character, background, and/or ties to the community, *see, e.g.*, *In the Matter of the Extradition of Noeller*, 2017 WL 6462358, at *5 (N.D. Ill. Dec. 19, 2017); *In the Matter of the Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1089 (C.D. Cal. 2010); *In the Matter of the Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994); the fact that the fugitive may

1   have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160–61; *In the Matter of the Extradition of*

2   *Pelletier*, 2009 WL 3837660, at *1, 3–4 (S.D. Fla. Nov. 16, 2009); discomfort, special dietary needs, or

3   medical concerns that can be attended to while incarcerated, *see, e.g.*, *Noeller*, 2017 WL 6462358, at

4   *8–9; *Martinelli Berrocal*, 263 F. Supp. 3d at 1301–02; *In the Matter of the Extradition of Kyung Joon*

5   *Kim*, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004); or the pendency of naturalization or other

6   immigration proceedings, *see, e.g.*, *In the Matter of the Extradition of Antonowitz*, 244 F. Supp. 3d 1066,

7   1072 (C.D. Cal. 2017); *In re the Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003).

8          In this case, no special circumstances justify consideration of bail.  The extradition request is

9   straightforward and based on eyewitness testimony given under oath.  It is for a crime recognized in

10  both countries and supported by probable cause.  There is nothing exceptional about this case that slants

11  in Ameen's favor.

12                  2.      **Ameen is a danger to the community**

13         If the Court were to find a special circumstance, the Court's analysis would then continue to the

14  examination of whether Ameen could meet his burden of demonstrating both that he is not a danger to

15  the community nor a flight risk.  Ameen cannot meet that burden.

16         As an initial matter, Ameen is accused of a brutal and premeditated murder.  The evidence of this

17  crime presented in the Iraqi request for extradition alone demonstrates that Ameen is a danger to the

18  community.  Moreover, the national security implications of the release of an alleged member of a

19  designated foreign terrorist organization are patent.  Not only is Ameen alleged to have himself

20  committed an act of violence as part of an ISIS convoy, Ameen then lied about the most material aspects

21  of his background in order to gain entry into the United States and flee the jurisdiction of the crime.  The

22  danger to the community is compounded by Ameen's lack of candor about who he is and what he has

23  done.

24                  a.      **Ameen's history as a member of AQI and ISIS**

25         Evidence from both the Iraq National Security Service, provided in the extradition request, as

26  well as the FBI, obtained through its own investigation, indicates since at least 2004, Ameen has been a

27  member of first AQI, then ISIS in Iraq.  He is not known to have ever renounced his membership in

28  either group.  Ameen has reportedly undertaken numerous acts of violence on behalf of these terrorist

organizations, ranging from planting improvised explosive devices ("IEDs") to the murder that is the subject of this extradition. The FBI has interviewed at least eight witnesses who identify the Ameen family—including Ameen himself, his father, brothers, and paternal cousins—as affiliated with AQI and ISIS. According to witnesses, it is common knowledge in Rawah, Iraq, that Ameen was a main local figure of AQI and ISIS. The Ameen family is alleged to be one of five native Rawah families that founded AQI in the region.

Ameen was born and raised in Rawah, Iraq. While publicly-available population estimates for Rawah vary between approximately 13,000 to 20,000, with fluctuations due to the violence in the region, the estimated population the population of Rawah in 2012 was approximately 19,600 people—roughly the size of Dixon, California. Rawah is located on the Euphrates River in the Anbar Province of Iraq. Ameen is a member of a large, established family in Rawah, once headed by Ameen's father, patriarch Abdulsattar Ameen Hussein. The family was wealthy, according to individuals from Rawah interviewed by the FBI. The family worked in commerce and transportation, but also owned land for agriculture. Ameen referenced his background as a "trader in vegetables" in his immigration application, and on his resume, Ameen lists his occupation in Iraq as "truck driver." Ameen has ten brothers and four sisters, and the family was known to reside together in a family compound in Rawah. Ameen additionally has a large extended family, and is known to be close to his paternal cousins.

Beginning in about 2004, Al Qaeda selected Rawah as a base of operations in the Euphrates River Valley. Foreign fighters—mujahidin—travelled to Rawah and joined in the fight against U.S. forces. According to witnesses residing in Rawah at the time, the Ameen family assisted in the installation of Al Qaeda in Rawah. One witness interviewed by the FBI stated that Ameen was a member of AQI who fought against the Iraqi police and the Americans. Another witness interviewed by the FBI stated that Ameen's father, Abdulsattar Ameen, supported the internationally-known Jordanian jihadist Abu Musab al-Zarqawi in founding AQI in Rawah. This reference to a connection to al-Zarqawi is also seen in the Iraq National Security Service report included in the extradition request.

Ameen is alleged to have participated in acts ranging from transportation of mujahidin, to soliciting funds at the marketplace on behalf of AQI, to robbing supply trucks and kidnapping drivers on behalf of AQI. The FBI interviewed a witness with personal knowledge of Ameen, who described

Ameen's personal vehicle in 2005 as a Kia Sportage with a cut-out roof and a PKC machine gun

mounted on the rear.  This witness recognized the passengers in the vehicle to be mujahidin fighters

because they carried black M-16 style guns; as well, Ameen's vehicle carried a black AQI flag and was

emblazoned with other AQI signage.  A different witness interviewed by the FBI described seeing

Ameen walk the streets of Rawah with a slung AK-47 style rifle.

Three witnesses interviewed by the FBI indicated Ameen's involvement with the placement of

IEDs.  Two individuals gave eyewitness accounts of seeing Ameen involved in the placement of IEDs;

one other witness had general knowledge that Ameen was known for placing IEDs.  One witness stated

that Ameen assisted in burying weapons caches on the family land.

Ameen was known to be particularly close to his paternal cousin Ghassan Mohammad Amin Al-

Rawi, a leader of AQI in Rawah.  Ghassan was captured by multinational forces in 2005.  A Department

of Defense press release announced the capture, noting that Ghassan made an admission that confirms

the account given by witnesses pointing to a connection between al-Zarqawi and the Ameen family:

". . . Ghassan Amin admitted to meeting al-Zarqawi once in January and allowed the terrorist leader to

reside with one of his relatives for about five days."  *Coalition Announces Capture of Zarqawi 'Key*

*Associate*,' http://archive.defense.gov/news/newsarticle.aspx?id=31713 (last accessed August 14, 2018).

A witness interviewed by the FBI described Ghassan as typically travelling in a five-car convoy of

fighters and guards.  This witness observed Ameen acting as a guard for Ghassan in such a convoy on

more than one occasion.  Ghassan, Omar Ameen, and other members of the convoy were armed with

shoulder-carried automatic rifles.  Ghassan and Omar Ameen were known to dress in traditional

Afghan-style clothing: pants cropped above the ankle, knee-length shirts, and Afghan-style hats that

made them look like Taliban.[4]

---

[4] One additional witness interviewed by the FBI—a native of Rawah who grew up with Ameen
and was still in contact with him—acknowledged the terrorist attacks committed by Ghassan but denied
Ameen's participation or affinity.  Instead, this witness claimed that when Ghassan committed attacks,
Ameen's family had to leave the area.  The witness further claimed that Ameen's family was known not
to be like Ghassan.  This account is contradicted by the accounts of the other witnesses, including
accounts based on eyewitness observations.  As well, Ameen never disclosed his relationship with
Ghassan at any point in the immigration process.  Instead, he denied having ever interacted with, having
any involvement with, or knowing any members of Al-Qaeda in Iraq or the Islamic State of Iraq.

Another additional witness interviewed by the FBI—a relative of Ameen—acknowledged that
many of his cousins who still live in Rawah "likely" have a radical mindset, but stated that he did not

Department of Defense records indicate that one of Ameen's brothers was detained by U.S. forces in 2005. This brother was taken into custody during a vehicle stop in Rawah in 2005. In his possession were two AK-47 rifles, two 9mm pistols, and an M21 Anti-Tank mine. This brother admitted to owning the weapons, as well as admissions that he was on a mission to blow up the house of the family of a suspected Coalition Forces collaborator, but charges against him were eventually dismissed in 2006. While in custody, this brother made additional admissions that corroborate the allegations against the Ameen family. Specifically, he admitted that Ghassan Amin is his first cousin, describing him as a Mujahidist. He admitted his role in providing support to Ghassan, and stated that sometimes Ghassan would bring a number of mujahidin whom he (Ameen's brother) would take to his brother's[5] house until they were gathered at the end of the day.

In a letter dated January 11, 2018, in response to an inquiry from the U.S. Embassy in Iraq, the Prime Minister's Office of the Government of Iraq indicated that members of the Ameen family, to include his brothers, are considered by the Government of Iraq to be members of ISIS.

**To / Embassy of the United States of America– Office of the Legal Attaché**

M [Subject] / <u>validation of information</u>

Our center offers you the best regards

Your numbered letter 17-98 in 10/02/2017, in this regard, we would like to inform you that the information contained in your above letter has been checked with all the Iraqi security and intelligence services. We include what has been reached at the present time.

1- The National Security Service informed us that the above-mentioned in your letter, and all members of his family are elements of Daesh [ISIS] terrorist gangs.
2- The Directorate of Military Intelligence informed us that Muhammad Abd-Al-Sattar Amin Al-Rawi is an element affiliated with terrorist organizations, and his brother Qusay Abd-Al-Sattar Muhammad Al-Rawi is an element of the terrorists Daesh in Nineveh Province, Tal `Afar district, so is his brothers; Lu`ai, Muhammad, and Mustafa and they are elements of Daesh terrorist organization.
3- Any further information will be provided to you later.

…with ample appreciation

**[This letter has been stamped by the National Operations Center,**
**And signed by Abd-Al-Amir Muhammad Ali,**
**The Director General of the National Operations Center**
**/1/2018]**

---

have any derogatory information about Ameen himself.

[5] Ameen's brother's statement did not specify the name of the brother he was referring to.

The Ameen family's support of terrorism continued through the rise of ISIS in 2014.  Media reports confirm the fall of Rawah to ISIS on or about June 22, 2014.  *See, e.g.*, Iraq crisis:  Rutba latest western town to fall to Isis, http://www.bbc.com/news/world-middle-east-27960142.  For the next three-and-a-half years, Rawah remained under ISIS control.  One witness interviewed by the FBI stated knowledge that the Ameen family home was an ISIS headquarters for Rawah.  Another witness described Ameen as an ISIS commander.

b.   **Warrants in Iraq**

There have been at least three previous warrants issued for Ameen's arrest:

(1) a warrant dated December 26, 2010, issued by the Republic of Iraq, Higher Judicial Court of Investigation, Central Investigative Court in Al-Karkh, Counterterrorism Services, charging Ameen, along with three of his brothers, with violation of Article 4/1 of the Counterterrorism Law;

(2) a warrant dated October 16, 2011, issued by the Republic of Iraq, Higher Judicial Court of Investigation, Central Investigative Court in Al-Karkh, Counterterrorism Service, charging Ameen and one of his brothers, two of his cousins, and two other individuals with violation of Iraqi Penal Code 406[1]/A, Murder; and

(3) a warrant dated December 24, 2017, issued by the Chiefship of the Federal Appellate Court of al-Anbar, Hit Inquiry Court, charging Omar Ameen with violation of Article 4/1 of the Counterterrorism Law.[6]

---

[6] In addition to these outstanding warrants, according to a document provided to the FBI from an individual with access to such records, in or about June 2008, Ameen was detained.  According to this document, Ameen was in the custody of an Iraqi Army infantry brigade.  The infantry brigade sent another document communicating to the Rawah Police Department a request for further information about Ameen.  The FBI interviewed an individual who was formerly the commander of the 28th Brigade, 7th Division, Iraqi Army—the unit that is identified on the first document.  This individual indicated that he/she was familiar with Ameen.  This individual was shown both of the documents, and recognized them, stating that original copies of these documents would be located at the battalion headquarters, which had been burned down by ISIS in approximately 2014.  This individual left his/her post approximately three months before the date on these documents, and therefore was not the commander of the military unit at the time these documents were drafted.  He/she provided the name of his/her successor to the FBI.  The FBI is in possession of a written statement by this successor, stating that the first document is a forgery, and that the signature on the document is not his/hers.  Because of these contradictory statements about the authenticity of the detention documentation, it is unknowable at this time the circumstances of Ameen's detention by the infantry brigade, whether he was in fact detained by the infantry brigade, and if he was, when and how he was able to secure his release from detention.

As well, on February 14, 2018, the Iraqi government sent a memorandum to the United States Embassy in Iraq, summarizing its intelligence reporting on the Ameen family.  The memorandum confirms Ameen's identifying information, listing his year of birth as 1973, and identifying his mother.

c.    **Misrepresentations in refugee application**

Ameen did not disclose any of his own associations with AQI or ISIS, nor those of his family members, on the immigration forms requiring such disclosure.  Ameen's intentional concealment of his affiliations, and his fabrication of the claims that were the basis of his refugee application, are a factor in this Court's analysis of dangerousness because none of Ameen's statements about his identity or background can be trusted.  This Court cannot be asked to supervise an individual who has so grossly misrepresented his background as alleged by the witnesses to this investigation that his present intentions in the community are unknowable.

In or about April 2012, Ameen arrived in Turkey and began the process of applying for refugee status.  This photograph of Ameen, which accompanies his refugee application to United States Citizenship and Immigration Services ("USCIS"), is an undated depiction of Ameen taken prior to May 2014:



Ameen concealed his true identity as a member of AQI and ISIS to immigrate to the United States.  He lied about his background and the circumstances of his departure from Iraq in order to evade detection, seeking to blend into the flow of legitimate refugees fleeing the conflict zone.  Indeed, Ameen

inverted the narrative, claiming instead to be a victim of violence in two instances:

(1)     Ameen claimed on his Resettlement Registration Form before the United Nations High Commissioner for Refugees ("UNHCR") that in 2010, his father, Abdulsattar Ameen Hussein, was killed due to his cooperation with the American military.  Ameen repeated this claim under oath on his I-590 Registration for Classification as Refugee before USCIS, stating that his father was "shot dead" because "he accepted to carry portable houses belong[ing] to the Iraqi military."  Ameen repeated the claim once again verbally under oath in an interview conducted in conjunction with his I-485 Application to Adjust Status.  In actuality, the death certificate for Abdulsattar Ameen (which Ameen did not submit with any of his applications) indicates he died from natural causes—a cerebral clot—on December 25, 2010.  The image below is an English translation of a copy of the death certificate of

Abdulsattar Ameen as given to the FBI by a witness who obtained it from an official records maintained at the hospital in Rawah.

Ameen would have known the true circumstances of his father's death because he admitted to USCIS in the interview under oath in support of his application to adjust status that he attended his father's funeral on the family farm.  Ameen's claim that his father was killed due to his possible assistance to military forces is a fiction, and his refugee application was approved in part on the basis of this false claim.

Not only did Ameen misrepresent the cause of his father's death, but he also falsified the nature of his father's involvement with AQI.  He did not disclose any of his family members' affinity for and participation in international terrorist organizations.  To the contrary, Ameen swore affirmatively in his I-590, Registration for Classification as Refugee, that none of his family members ever had connections to any political parties or paramilitary organizations.  By concealing the true nature of his father's membership in AQI, Ameen misdirected USCIS away from its inquiry into any possible disqualifying ties to terrorism.

(2)     Ameen claimed on his refugee application that on March 4, 2012, when he was living in Baghdad with one of his brothers, their home was raided by masked, black-clad men, and the brother was taken away and not heard from again.  Ameen claimed the he was able to escape, and attributed the raid and kidnapping to the "Mahdi Army," a reference to Jaish Al Mahdi ("JAM").[7]  According to Ameen, he feared persecution based on the kidnapping of his brother if he were to remain in Iraq. Ameen repeated the claim of feared persecution based on this brother's disappearance on his adjustment of status application.

In actuality, an arrest warrant was issued from the Higher Judicial Court of Investigation in Al-Karkh, on December 26, 2010, for the arrest of that brother, Ameen, and two of his other brothers, charging them with terrorism, in violation of Article 4/1 of the Counterterrorism Law of Iraq.  A custody spreadsheet from the Iraq Counterterrorism Service indicates the brother's arrest "since January 22,

---

[7] Jaish Al Mahdi ("JAM") is a militant group formed by Muqtada al-Sadr in June 2003 in response to the U.S. invasion of Iraq, with the goal of establishing an Iraqi Shiite government.  Ameen's refugee claim was that he was targeted by JAM because of his Sunni background.

2011."[8]  It is unknown when the brother was released from custody nor the circumstances of his release in order to validate Ameen's account that the brother was residing with Ameen in March 2012.  Then, in November 2012, a document from the Higher Judicial Counsel reflects that the brother was again detained by the Government of Iraq.[9]  When asked about this brother in his May 26, 2016 interview in support of his adjustment of status application, Ameen indicated that this brother was now safe, alive, and living in Rawah.  At that time, 2016, Rawah was known to still be under ISIS control.

These two claims of past persecution formed the basis of Ameen's acceptance as a refugee.  By falsely claiming to be a victim of past persecution, Ameen created a narrative that resulted in approval of his refugee application.

Additionally, Ameen omitted any reference to his criminal conduct or his AQI/ISIS membership on any of his refugee documentation, either before the UNHCR or the United States government.  Instead, he affirmatively stated that he had no disqualifying associations or history that would bar his admission to the United States.  He maintained these false claims across all his immigration applications, never wavering in his representation of his background:

- When asked under oath at his refugee interview by a USCIS officer in Turkey "Have you ever interacted with, had involvement with, or known any members of . . . Al Qaeda in Iraq . . . the Islamic State of Iraq or any other armed group or militia?"  Ameen answered "no."  Ameen never disclosed his relationship with his cousin Ghassan al-Rawi, nor did he reveal the background of his father Abdulsattar Ameen, nor any of his brothers' involvement in terrorist activities.  This misrepresentation cut off a line of inquiry into his familial ties to terrorism.  While Omar Ameen was candid in disclosing the names of his parents and siblings on his immigration paperwork, he concealed the membership of any family member in AQI or ISIS, in contradiction to the statements of witnesses interviewed by the FBI and the information from the Iraq National Security Service.

- When asked in his written Sworn Statement in support of his refugee application "Have you ever

---

[8] On that same document, one of Omar Ameen's brothers is also listed as being under arrest since that same date.

[9] The November 2012 detention log also indicates the detention of one of Omar Ameen's brothers.

been arrested, or have you ever committed, or helped someone else commit, any crimes?" Ameen answered "no." In actuality, the witnesses interviewed by the FBI and referred to throughout this pleading allege numerous crimes ranging from robbery to placing IEDs.

- When asked in his written Sworn Statement in support of his refugee application "Have you ever engaged in . . . any other form of terrorist activity? Ameen answered "no." In actuality, Ameen is alleged to have engaged in various forms of terrorist activity, from 2004 through his departure from the region for the United States in 2014.

- When asked in his written Sworn Statement in support of his refugee application "Have you ever solicited . . . funds for any . . . organization that has ever engaged in . . . any . . . form of terrorist activity?" Ameen answered "no." In actuality, Ameen is alleged to have been seen soliciting funds for AQI from merchants in the Rawah marketplace.

- When asked in his written Sworn Statement in support of his refugee application "Have you ever provided support, including . . . weapons . . . for any person or organization that has ever engaged in . . . any form of terrorism?" Ameen answered "no." In actuality, Ameen is alleged to have been seen carrying weapons in his role as a member of AQI/ISIS, and is alleged to have assisted in burying a cache of weapons near residences in Rawah belonging to the Ameen family.

- When asked in his written Sworn Statement in support of his refugee application "Have you ever been a . . . member of a terrorist organization or a member of a group which endorses terrorist activity?" Ameen answered "no." In actuality, Ameen is alleged to have been a member of AQI/ISIS since 2004 and is not known to have renounced his membership.

Ameen's negative answers cut off a line of questioning relevant to his admissibility to the United States. Based on the written and verbal answers given by Ameen, his refugee application was approved by USCIS on June 5, 2014.

### d.  **Return to Iraq and murder of Ihsan**

Ameen did not immigrate directly to the United States following the approval of his application, but instead is alleged to have returned to Iraq to commit the murder that is the subject of this extradition request. Ameen's passport does not reflect any departures from Turkey after his entry on April 1, 2012. Nevertheless, Ameen stated during his May 2014 refugee interview with USCIS in Turkey that he had

returned many times to Iraq.[10]  Though this statement predates the date of the alleged murder, it is

confirmation of the porous nature of the Iraq-Syria-Turkey borders in the 2014 timeframe.

The media also reported on the fluidity of the Iraq-Syria and Syria-Turkey borders in this

timeframe.  *See* "A Path to ISIS, Through a Porous Turkish Border," New York Times, March 9, 2015.

A graphic from the Institute for the Study of War demonstrates the geographic areas of ISIS control in

the region in early June 2014, to include the Syrian border near Rawah:



Ameen's resume, prepared in 2018, is consistent with a return to Iraq by on or about June 22,

2014 (the day of the fall of Rawah to ISIS).  Ameen lists employment in Turkey through May of 2014,

then shows a gap in employment until Ameen's immigration to the United States:

---

[10] There is no transcript or recording of this interview, but the comment is annotated on Ameen's application, with the implication that Ameen returned to Iraq many times between in or around April 2012 and the May 22, 2014 date of the USCIS interview.

1

2

3

4

5

6

7

8

9

10

11

12

13

14



15      Apart from the evidence contained in Iraq's extradition request, which alone establishes probable

16 cause that Ameen committed the alleged offense, the FBI has also interviewed witnesses to the murder

17 of Ihsan.  These witness statements confirm the later statements given under oath in Iraq as part of the

18 investigation of the murder, and leave no doubt that Ameen is a danger to the community.

19      Multiple witness interviewed by the FBI reported seeing Ameen in Rawah in or about the time of

20 the fall of Rawah to ISIS.  One did not make any statement regarding the murder, but made a general

21 statement of having seen Ameen before the fall of Rawah.

22      Another witnesses did not see the murder itself, but described seeing Ameen pass by as part of

23 the armed convoy en route to the house of Ihsan.  The convoy was made up of three trucks, two tan and

24 one white.  All three trucks bore ISIS paraphernalia, including ISIS flags.  At least one of the tan trucks

25 had a weapon mounted on it.  Each vehicle carried three or more men, armed with rifles and dressed in

26 what the witness recognized to be ISIS clothes.  Omar Ameen was in the passenger seat of the white

27 vehicle, wearing a black shemagh.  The witness believed Ameen was likely the commander of the

28 convoy.  The convoy continued away, stopping in the area of Ihsan's house, and the witness then heard a

burst of rifle fire.  This witness positively identified Ameen from this photograph:



In another account of the murder given to the FBI by a witness referenced in the extradition request, a witness gave a description of the ISIS vehicle[11] convoy.  S/he recalled an AMRAP, a 2-cab Hilux, and a Humvee, each carrying multiple males.  The witness recalls each member of the convoy brandishing some type of ISIS paraphernalia, including flags and vests.  The witness saw Omar Ameen in the convoy,[12] and described him as having shoulder-length hair, a beard, wearing Afghan garb, and carrying an AK-47.  The witness identified Ameen from this photo, one of a series of photos of individuals shown to him/her on a smart phone.

_____

[11] The extradition request describes the convoy as containing four vehicles; the eyewitness's statement to the FBI indicates three vehicles.

[12] The witness made additional statements relating to the murder to the FBI, but elaborating on those statements in a publicly filed document may reveal information that could disclose the identity of the witness.



e.     **Immigration to the United States**

Ameen returned to Turkey on an unknown date and traveled on to the United States, arriving on November 4, 2014.  After eventually settling in Sacramento, California, Ameen filed an I-485, Application to Adjust Status.  In an interview on May 26, 2016, under oath in support of that application, Ameen affirmed all the answers given in support of his refugee application.  Ameen stated that he had not given false testimony to enter the United States, and also that he had not given false testimony to his refugee application.

- On his written I-485 application to adjust status, and also in the interview, when asked "Have you EVER ordered, or called for, or assisted with the killing of any person?"  Ameen answered "no."  When asked "Have you ever committed the killing of any person?"  Ameen answered "no."  In actuality, on or about June 22, 2014, Ameen is alleged to have killed Ihsan in collaboration with other members of ISIS.

- On his written I-485 application to adjust status, and also in the interview, when asked "Have you EVER, in or outside the United States knowingly committed any crime of moral turpitude . . . for which you have not been arrested?"  Ameen answered "no."  In actuality, on or about June 22, 2014, Ameen in alleged to have committed the crime of premeditated murder, a crime of moral turpitude, for which he was not arrested.

- When asked on his written I-485 application to adjust status, and also in the interview, "Have

1   you EVER been a member of, assisted in, or participated in any group, unit, or organization of

2   any kind in which you or other persons used any type of weapon against any person or

3   threatened to do so?"  Ameen answered "no."  In actuality, Ameen is alleged to have been a

4   member of AQI and ISIS since 2004 and has not renounced his membership.

5       Based on the allegations in the extradition request from Iraq and by the witnesses interviewed by

6   the FBI, Ameen knowingly and willfully provided this false information and testimony for the purpose

7   of evading the admissibility requirements of the United States.  Ameen sought to obtain permanent

8   residence in the United States on the basis of these false answers.

9       All of these corroborating allegations demonstrate the grave danger to the community if Ameen

10  were to be released.  As the Ninth Circuit has recognized in international terrorism cases, the Court must

11  consider the danger that would be imposed by release, to include any community abroad that is alleged

12  to have been previously targeted.  *United States v. Hir*, 517 F.3d 1081, 1087–90 (9th Cir. 2008).  Ameen

13  is alleged to be closely involved with one of the most notorious international terrorist organizations, and

14  to have committed murder on behalf of that organization, and there is no scenario under which he would

15  be able to meet his burden of proving that he would not be a danger to the community upon his release.

16          3.      **Ameen is a flight risk**

17      Ameen also cannot meet his burden of demonstrating that he would not be a flight risk upon

18  release.  A fugitive charged with crimes in another country is already by definition in flight or

19  deliberately absent from that jurisdiction, and the fact that the fugitive has evaded prosecution in his

20  home country is indicative of his risk of flight in the United States.  *Cf. United States v. Botero*, 604 F.

21  Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a

22  substantial risk of flight, this Court does not find any meaningful distinction between a person who left

23  the country when he learned of pending charges and one who already outside the country refuses to

24  return to face these charges.  The intent is the same—the avoidance of prosecution.") (citing *Jhirad v.*

25  *Ferrandina,* 536 F.2d 478, 483 (2d Cir. 1976)).

26      Ameen has demonstrated that he is highly adept at moving across borders—by his own

27  admission in his immigration paperwork he has returned to Iraq from Turkey many times, yet the

28  evidence of these crossings is not in his passport.  He has siblings in Turkey who may be willing to

REQUEST FOR DETENTION                                   25

harbor him.  Moreover, the seriousness of the offense with which Ameen is charged renders him a

significant flight risk.  *See, e.g.*, *In the Matter of the Extradition of Perez-Cueva*, 2016 WL 884877, at

*3 (C.D. Cal. Mar. 7, 2016) (seriousness of allegations against fugitive "militates against release on

bail").  The maximum penalty faced by Ameen upon his extradition to Iraq is death.  Article 406(1),

Penal Code of Republic of Iraq.  Further flight from the United States to another country is a reasonable

assumption.

    Allowance of bail in any amount would not guarantee Ameen's presence in court; Ameen cannot

meet his burden of demonstrating that he is not a flight risk.

**IV.**     <u>**CONCLUSION**</u>

    For the foregoing reasons, the United States requests that Omar Ameen be detained pending

resolution of this extradition proceeding.

Dated:  August 15, 2018

                                       McGREGOR W. SCOTT
                                       United States Attorney

                           By:   <u>*/s/ Audrey B. Hemesath*</u>
                                       AUDREY B. HEMESATH
                                       HEIKO P. COPPOLA
                                       Assistant United States Attorneys

                                       CHRISTOPHER J. SMITH
                                       Acting Associate Director
                                       JOHN D. RIESENBERG
                                       Trial Attorney
                                       Office of International Affairs

# EXHIBIT B

U.S. Citizenship and Immigration Services
National Records Center, FOIA/PA Office
P.O. Box 648010
Lee's Summit, MO 64064-8010


To Whom It May Concern:

Pursuant to the Freedom of Information Act, I hereby request the following records:

Copies of all immigration files, photos, annotations, and investigations compiled for Omar Abdulsattar Ameen Husayn al-Sarhani al-Rawi, born December 20, 1973, in Al Anbar Governorate, Iraq. These copies should include, but are not limited to:

1. Resettlement Registration Form
2. I-590 Registration for Classification as Refugee
3. I-485 Application to Adjust Status
4. Transcripts of all interviews conducted in conjunction with his I-485 Application to Adjust Status
5. Transcript of a May 26, 2016, interview in support of his adjustment of status application
6. Transcripts of all interviews conducted during his refugee interviews with USCIS officers in Turkey prior to his arrival in the United States
7. Written sworn statement in support of his refugee application
8. Approved refugee application, dated June 5, 2014

As the FOIA requires, please release all reasonably segregable nonexempt portions of documents.

To help to determine my status to assess fees, you should know that I am a representative of the news media affiliated with ABC10, a news station in Sacramento, California, and this request is made as part of news gathering and not for a commercial use.

If you have any questions regarding this request, please contact me at (916) 919-1740, or madams@abc10.com. I look forward to receiving your response within the twenty-day statutory time period.

Thank you for your consideration of this request.

Sincerely,

**Michael Anthony Adams**
*Filmmaker – Special Projects Unit*



A **TEGNA** Company  |  400 Broadway, Sacramento, CA 95816
madams@abc10.com  |  **P**. 916.919.1740  |  Twitter: @michaeladams317  |  abc10.com

# EXHIBIT C



September 17, 2018

**NRC2018135016**

Michael Anthony Adams
ABC 10 News
400 Broadway
Sacramento, CA 95816

Dear Michael Anthony Adams:

This is in response to your Freedom of Information Act/Privacy Act (FOIA/PA) request received in this office August 30, 2018 regarding Omar Abdulsattar Ameen Husayn Al Sarhani Al Rawi.

After carefully considering your request, we must deny it in its entirety pursuant to 5 U.S.C. § 552(b)(6). In order to obtain these records your request must demonstrate one or more of the following criteria:

- Written authorization from the individual(s) permitting disclosure of the records to you, which consists of a written statement from the records' subject(s) stating his/her full name, current address, and date and place of birth. Additionally, the written statement must be signed by the records' subject(s) and the signature must either be notarized or signed under penalty of perjury, or
- Proof of parentage with the requester's verification of identity if the subject of record is a minor at the time of the request, or
- Proof of court-appointed guardianship with the requester's verification of identity, or
- Proof that the subject [or subjects] of your request [is] [are] deceased; or
- A clear demonstration that the public interest in disclosure outweighs the personal privacy interest(s) of the individual(s) and that significant public benefit would result from the disclosure of the requested records.

Your request did not satisfy any of the above criteria. Where a FOIA requester seeks information about individuals in personnel, medical, and similar files FOIA Exemption 6 protects from disclosure information that, if released, would constitute a clearly unwarranted invasion of personal privacy. To determine whether the disclosure of personal information would constitute an unwarranted invasion of personal privacy, Exemption 6 requires the government to balance the privacy interests of individuals that would be compromised by disclosure of government records about them against the public interest in release of the records. The only relevant public interest to be considered is the extent to which the requested information sheds light on the agency's performance of its statutory duties. Where the privacy interest outweighs the public, the information is protected from disclosure. In the absence of written authorization permitting disclosure of the records to you, proof that the subject is decease, or a demonstration of a public interest that would outweigh the subject's privacy interest, you are not entitled to the requested records under the FOIA.

You have the right to file an administrative appeal within 90 days of the date of this letter. By filing an appeal, you preserve your rights under FOIA and give the agency a chance to review and reconsider your request and the agency's decision. You may file an administrative FOIA appeal to USCIS at: USCIS FOIA/PA Appeals Office, 150 Space Center Loop, Suite 500, Lee's Summit, MO 64064-2139. Both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

If you would like to discuss our response before filing an appeal to attempt to resolve your dispute without going through the appeals process, you may contact our FOIA Public Liaison, Jill Eggleston, for assistance at:

U.S. Citizenship and Immigration Services
National Records Center, FOIA/PA Office
P. O. Box 648010
Lee's Summit, MO 64064-8010
Telephone: 1-800-375-5283
Email: FOIAPAQuestions@uscis.dhs.gov

If you are unable to resolve your FOIA dispute through our FOIA Public Liaison, the Office of Government Information Services (OGIS), the Federal FOIA Ombudsman's office, offers mediation services to help resolve disputes between FOIA requesters and Federal Agencies. The OGIS does not have the authority to handle requests made under the Privacy Act of 1974. The contact information for OGIS is:

Office of Government Information /Services
National Archives and Records Administration
8601 Adelphi Road – OGIS
College Park, MD 20740-6001
Telephone: 202-741-5770
          877-684-6448
Email: OGIS@NARA.GOV
Website: OGIS.ARCHIVES.GOV

Sincerely,

Jill A. Eggleston
Director, FOIA Operations